UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Jeffrey M. Gray

    v.                             Civil No. 14-cv-386-PB
                                       Opinion No. 2016 DNH 168

John Perkins et al.[1]

**O R D E R**

Pro se plaintiff Jeffrey M. Gray, an inmate in the custody of the New Hampshire Department of Corrections ("DOC"), and presently incarcerated at the New Hampshire State Prison ("NHSP"), has sued defendants under 42 U.S.C. § 1983, asserting violations of his First and Eighth Amendment rights alleged to have occurred at the NHSP and the Northern New Hampshire Correctional Facility ("NCF"). Before the court is defendants' motion for summary judgment (doc. no. 72, and supplemental

---

[1] The defendants to this action are: New Hampshire Department of Corrections ("DOC") Commissioner's office employee Christopher Kench; (former) Northern New Hampshire Correctional Facility ("NCF") Warden Edward Reilly; NCF Librarian John Perkins; NCF Lt. Edward McFarland; NCF Sgt. George Bigl; NCF Corrections Officer ("C.O.") Roy Tripp; (former) New Hampshire State Prison ("NHSP") Warden Richard Gerry; NHSP Lt. James Brown; NHSP Sgt. Sheryl St. Peter; NHSP C.O. Stephen P. Sullivan; NHSP C.O. Frank H. Logan, III; DOC Physician Dr. Celia Englander; NHSP Medical and Forensic Services Deputy Director Ransey Hill; NHSP Nurse Practitioners Lisa Savage and Corina Neculai; NHSP Nurses Donna Dufresne and Cynthia Chapman; NHSP Physical Therapist Bernadette Campbell; DOC Oral Surgeon Dr. Paul Levy; NHSP Dentist Dr. Edward Dransite; DOC Dental Hygienist Laurent Denecourt; and NHSP Dental Assistant Alexis White.

memoranda, doc. nos. 103 and 111).[2]  Plaintiff objects (doc. nos.
108 and 118-1).

## I.  <u>STANDARD</u>

Summary judgment is warranted where "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); see also
Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir.
2016).  "An issue is 'genuine' if it can be resolved in favor of
either party, and a fact is 'material' if it 'has the potential
of affecting the outcome of the case.'" Xiaoyan Tang, 821 F.3d
at 215 (internal quotation marks and citations omitted); see
also Commodity Futures Trading Comm'n v. JBW Capital, LLC, 812
F.3d 98, 105 (1st Cir. 2016) ("'the mere existence of <u>some</u>
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no <u>genuine</u> issue of <u>material</u> fact'"
(emphasis in original) (citation omitted)).  At the summary
judgment stage, the court "'draw[s] all reasonable inferences in
favor of the non-moving party,' but disregard[s] 'conclusory
allegations, improbable inferences, and unsupported

---

[2] The motion for summary judgment was filed by those defendants
who are current and former employees of the DOC.  Defendants Dr.
Celia Englander and Dr. Paul Levy have joined the motion.

speculation.'"  Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation omitted).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016)  Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'"  Id. (citation omitted).  "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'"  Id. (citations omitted). The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment."  Id.


## II.  BACKGROUND

A.  Claims

The claims presently in this case, which have been served on individual defendants, are as follows[3]:

1.   NCF Librarian John Perkins and NCF Corrections Officer

---

[3] See Jan. 14, 2016, Report and Recommendation ("R&R") (doc. no. 91), approved by Feb. 16, 2016, Order (doc. no. 101); May 7, 2015, R&R (doc. no. 32), approved by June 1, 2015, Order (doc. no. 38).

("C.O.") Roy Tripp retaliated against Gray for exercising his First Amendment right to petition the government for a redress of grievances, by barring Gray from the law library on and after August 29, 2014, and by causing Gray to lose his prison job, in violation of Gray's First Amendment rights.

2.   NHSP C.O. Stephen P. Sullivan acted with deliberate indifference to a substantial risk of serious harm to Gray when Sullivan, on April 28, 2014, showed the other inmates in Gray's cell a newspaper article describing Gray's charges and conviction for sexual offenses, placing Gray in danger of being harmed by the other inmates, in violation of Gray's Eighth Amendment right not to be subject to cruel and unusual punishment.

3.   NHSP Lt. James Brown acted with deliberate indifference to a substantial risk of serious harm to Gray on November 19, 2014, by telling several inmates, including Gray's cellmates, that Gray had filed grievances accusing one of his cellmates of engaging in inappropriate sexual behavior involving Gray, as Brown's statements placed Gray in danger of being harmed by the other inmates, in violation of Gray's Eighth Amendment right not to be subject to cruel and unusual punishment.

4.   DOC physician Dr. Celia Englander, NHSP Nurse Practitioners Lisa Savage and Corina Neculai, NHSP Nurses Donna Dufrene and Cynthia Chapman, NHSP Physical Therapist Bernadette Campbell, (former) NCF Warden Edward Reilly, (Former) NHSP Warden Richard Gerry, and DOC Commissioner's office employee Christopher Kench, acting with deliberate indifference to Gray's serious medical needs (sleep apnea, ulcers, Helicobacter Pylori stomach disease ("H-Pylori"), chronic lower back pain, and tinnitus), denied Gray constitutionally adequate medical care for those conditions, or denied Gray's grievances concerning his medical care, in violation of Gray's Eighth Amendment rights.

5.   On May 6, 2014, NHSP C.O. Frank H. Logan, III, violated Gray's Eighth Amendment rights to adequate medical treatment and safe conditions of confinement when, with deliberate indifference to a substantial risk of serious harm, he placed Gray in a top bunk, resulting in injury to Gray, despite knowing that Gray had been issued a "bottom

bunk pass" by the prison medical department.

6.   On October 9, 2014, NHSP Sgt. Sheryl St. Peter and NHSP Lt. James Brown violated Gray's First Amendment right to freely exercise his religion by seizing and failing to return Gray's Bibles, religious books, and religious pamphlets, pursuant to a cell search.

7.   DOC Oral Surgeon Dr. Paul Levy, NHSP Dentist Dr. Edward Dransite, NHSP Dental Hygienist Larry Denecourt, NHSP Dental Assistant Alexis White, NHSP Medical and Forensic Services Deputy Director Ransey Hill, (former) NHSP Richard Gerry, and DOC Commissioner's office employee Christopher Kench, denied Gray constitutionally adequate dental care, or denied Gray's grievances concerning his dental care, in violation of Gray's Eighth Amendment rights.

8.   On or around February 15, 2013, NCF Lt. McFarland and NCF Sgt. Bigl, acting with deliberate indifference to a substantial risk of serious harm to Gray, endangered Gray's safety by requiring him either to stay in a cell with an inmate who had threatened him, or to give up his bottom bunk medical pass and be placed in a top bunk, in violation of his Eighth Amendment rights.

B.   <u>Facts</u>[4]

1.   <u>DOC Administrative Grievance Procedures</u>

At all times relevant to this matter, the DOC employed a

---

[4] In determining the disputed and undisputed facts for summary judgment purposes, the court considered the factual assertions in Document Nos. 1, 3, 6, 12, 13, 16, 19, 23, 27-31, 34, 37, 41, 45-47, 62, 63, 65, 72, 73, 76, 81, 86, 87, 103, 105, 108, 111, 112, 114-123, 129-131, 136-141, and 145, and the attachments to those documents.  The listed documents are pleadings, motions, objections, declarations, affidavits, testimony, and other filings by the parties that have been properly verified pursuant to 28 U.S.C. § 1746, or are otherwise of sufficient evidentiary quality to be considered in support of or opposition to summary judgment.  <u>See</u> Fed. R. Civ. P. 56(c).  Unless otherwise indicated, the facts set forth in this Order are undisputed.

three-level procedure for handling inmate grievances "concerning any condition of confinement."  DOC Policy and Procedure Directive ("PPD") 1.16(III)(E) (Doc. No. 72-3 at 2).  Inmates "are informed of the grievance procedures through the Inmate Manual" and through the published grievance policy.  PPD 1.16(III)(G) (Doc. No. 72-3 at 2).

To complete the first level of the DOC's grievance process, an inmate utilizes an Inmate Request Slip ("IRS") "addressed to the lowest level staff person with the authority to address the issue raised."  PPD 1.16(IV)(A)(1) (Doc. No. 72-3 at 2).  "A request slip regarding any issue must be received within 30 calendar days of the date on which the event complained of occurs."  Id.  An inmate dissatisfied with the response to an IRS may, within thirty days of the date of that response, direct a Grievance Form to the Warden or Director of the DOC facility in which the inmate is then housed.  PPD 1.16(IV)(B) (Doc. No. 72-3 at 3).  An inmate dissatisfied with the Warden's response to his grievance, within thirty days of the denial of his grievance to the Warden, may appeal that denial to the DOC Commissioner.  PPD 1.16 (IV)(C)(1) (Doc. No. 72-3 at 4).  The timeframes set forth in PPD 1.16, and the use of appropriate forms, at each level of the DOC grievance process, are mandatory.  PPD (IV)(E)&(F) (Doc. No. 72-3 at 4-5).

2.   <u>Claim 1 – August 29, 2014, Retaliation</u>

On July 8, 2014, Gray, while housed at NCF, was hired to be
a teacher's assistant in the NCF Education Department.  <u>See</u>
Pl.'s V. Second Am. Compl. (doc. no. 23 at 30) ("VSAC").  Ten
days later, on July 18, 2014, Gray got into a heated discussion
with a staff member at the NCF law library.  <u>Id.</u> at 32.  NCF
Librarian John Perkins accused Gray of giving the staff member a
hard time.  <u>Id</u>.  Gray states that he and Perkins then argued,
and Perkins called NCF C.O. Roy Tripp and asked Tripp to remove
Gray from the law library.  <u>Id.</u> at 32-33.  Once outside the law
library, Gray told Tripp that he was going to file a grievance
against him.  <u>Id.</u> at 33.  Gray has averred that Tripp responded
by firing Gray from his teacher's assistant job.  <u>Id.</u>; Decl. of
Jeffrey M. Gray, June 17, 2016 (Doc. No. 118-1 at 18) ("Gray
Decl.").  Gray claims that Tripp further stated on July 18,
2014, that if Gray filed a grievance against him or Perkins,
Tripp would initiate disciplinary proceedings against Gray for
filing a false grievance.  Gray Decl. at 18.

On August 29, 2014, Gray was again in the NCF law library.
Gray asserts that Perkins refused to allow Gray to check law
books out of the library because Gray had two overdue books
checked out of the recreational library.  VSAC, at 34.  Gray
asserts that Perkins also refused to give Gray a New Hampshire

Supreme Court appeal form.  Id. at 35.  According to Gray, he asked an NCF inmate law clerk for a "42 USC § 1983 Complaint Packet," and told Perkins and Tripp that he intended to file a complaint against Perkins in federal court for denying Gray law books.  Id. at 35-36.  Perkins then asked Tripp to remove Gray from the library, which Gray claims was retaliation for Gray's stated intention to file a lawsuit against Perkins.  Id. at 36. Gray claims that as of August 29, 2014, Tripp and Perkins ordered that Gray have no further access to the NCF law library or to any law books or materials.  Id. at 37.  Gray claims that after removing him from the law library on August 29, Tripp again threatened to retaliate against Gray if Gray filed a grievance against Tripp or Perkins, by filing a disciplinary report charging Gray with filing a false grievance.  Gray Decl. at 21-22, 24.

Gray states that, while walking to his housing unit after leaving the law library on August 29, 2014, he was stopped by NCF Lt. Orlando and NCF Sgt. Fountaine.  Id. at 23; VSAC at 37. Gray states that he informed Orlando of what had transpired in the law library that day.  VSAC at 37; Gray Decl. at 23.  Gray also told Orlando and Fountaine about Tripp's retaliation threat.  Gray Decl. at 24.  As stated in Gray's Declaration, Orlando told Gray not to file grievances against Tripp or

Perkins; Orlando assured Gray he would investigate the incident and refer it to the DOC Bureau of Investigations; and Orlando said that Gray did not have to file any grievances through the prison's administrative procedure.  Id.  Gray states that he never learned of the result of the investigation.  Id. at 25.

Gray states that on June 19, 2015, while housed at the NHSP, he finally summoned the courage to file a grievance against Perkins and Tripp, despite Tripp's previous threats of retaliation.  Id.  On that date, Gray sent an IRS to Patricia Lynn, the NCF Director of Education, complaining that Perkins and Tripp had removed Gray from the law library on July 18 and August 29, 2014, barred him from the law library altogether as of August 29, 2014, and caused Gray to lose his teacher's assistant job.  June 19, 2015, IRS (Doc. No. 72-5).

On June 23, 2015, Tripp responded to that IRS, stating that Gray's effort to grieve the events of July and August 2014 was untimely, and therefore, Tripp was not going to address them. Id.  Tripp's response further stated that neither Tripp nor Perkins had imposed any bar to law library access on Gray, and that Gray only had to request access using an IRS to be scheduled for library time.  Id.  Tripp added that Gray had been placed on reduced pay status for creating a disturbance in the law library.  Id.

On June 23, 2015, Gray appealed Tripp's denial of his IRS to NHSP Warden Richard Gerry, complaining that Tripp and Perkins had retaliated against Gray for exercising his First Amendment rights, by firing him from his job and denying law library access.  June 23, 2015, Grievance Form (Doc. No. 72-8 at 2).  On June 30, 2015, Gerry denied Gray's grievance, stating that Gray's complaint had been untimely, and adding that Tripp's response to Gray's IRS had been appropriate.  Id.

On July 2, 2015, Gray appealed Gerry's decision to DOC Commissioner William Wrenn.  July 2, 2015, Grievance Form (Doc. No. 72-13 at 2).  Acting on Wrenn's behalf, Christopher Kench denied the grievance on July 20, 2015.  Id.

### 3.   Claim 2 – April 2104 Endangerment

Gray claims that in April 2014, NHSP C.O. Stephen P. Sullivan showed Gray's cellmates a newspaper article describing Gray's charges and conviction for sexual assault.  VSAC at 26; Gray Decl. at 34.  Gray asserts that Sullivan endangered Gray's safety by informing other inmates that Gray was a sex offender. VSAC at 26; Gray Decl. at 34.

On May 9, 2014, Gray states that he verbally complained to NHSP Sgt. David Cormeir about Sullivan's behavior and the resulting threat to Gray's safety, and told Cormier that he wanted to file a written grievance against Sullivan.  Gray Decl.

at 36-37.  Gray was placed in protective custody status and transferred out of his housing unit, and thus away from Sullivan, that day.  Id. at 36.  In his response to Gray's stated intention to file a grievance against Sullivan, Cormeir told Gray that Gray's "'staff complaint' is not grievable through the written grievance process, and that [Gray] would have to raise the issue about Sullivan instead with the protective custody review board since Sullivan was one of the reasons in [Gray's] statement why [Gray] was in such fear for [his] safety."  Id. at 37-38.  Cormeir told Gray that there was no pertinent relief that could be granted by the written grievance process, as Gray had been removed from Sullivan's unit, and instructed Gray not to file a written administrative grievance against Sullivan.  Id. at 38.  Gray asserts that he made an oral grievance to the protective custody review board about Sullivan's actions, but did not receive any response.  Id. at 39.

      4.   Claim 3 – November 2014 Endangerment

Gray asserts that on November 21, 2014, NHSP Lt. James Brown told several of Gray's cellmates that Brown was in possession of two grievances written by Gray in which he accused one of his cellmates, Christos Kalaitzidis, of "doing gay stuff to [Gray]" and "looking at [Gray] creepy while he is sleeping."

11

VSAC at 45; Aff. of Christos Kalaitzides, Nov. 23, 2014 (Doc.
No. 16-2) ("Kalaitzides Aff.").  Gray asserts that Brown's
statements to Gray's cellmates endangered Gray's safety.

Gray avers that, upon learning of Brown's statements, he
went to Brown's office and spoke to him about the incident, and
that Brown denied making the statements.  Gray Decl. at 41.
Gray then met with Brown and NHSP Cpl. Towers.  Id.  Gray states
that after those meetings, he asked Brown for a grievance form,
but Brown refused to give him a form.  Id. at 42.  Brown stated
that Gray's "'staff complaint' about [Brown's] 'inappropriate
sexual comments' was not grievable through the formal written
grievance process" and instead would have to be addressed within
the context of the two grievances Brown then had in his
possession, that were being sent to Gerry.  Id.  In reliance on
Brown's statements, Gray did not file a separate administrative
grievance concerning Brown's statements to Gray's cellmates.
Id. at 43.

    5.   Claims 5 and 8 – Bottom Bunk Pass Incidents

Gray asserts that on February 19, 2013, while Gray was
housed at NCF, NCF Lt. Edward McFarland and NCF Sgt. George Bigl
forced Gray to forego his medical bottom bunk pass, after Gray
filed two IRS forms complaining that his cellmate posed a threat
to Gray's safety, and moved Gray into a different cell where he

was assigned to a top bunk.  VSAC at 16; Gray Decl. at 44.  Gray
asserts that he verbally complained to McFarland and Bigl about
being placed in a top bunk, and that those officers told Gray
there were no bottom bunks available.  Gray Decl. at 45.  Gray
further asserts that he requested a grievance form from Bigl and
McFarland, but the officers refused to give him one, stating
that being moved to a bottom bunk was not grievable.  Id. at 45-
46.

Gray claims that, in May 2014, while he was housed at the
NHSP, C.O. Frank Logan forced Gray to move to a top bunk despite
knowing that Gray had been issued a bottom bunk pass.  Id. at
47.  Gray asserts that he fell out of his bunk that night, and
suffered "severe cuts and lacerations" to his leg.  VSAC at 27.
Relying on Bigl and McFarland's previous statement that being
moved out of a bottom bunk was not a grievable issue, Gray did
not file an administrative grievance concerning this incident.
Gray Decl. at 47-49.

      6.   Claim 4 – Medical Care

Gray asserts, and defendants have not disputed, that prior
to arriving at the NHSP, Gray suffered from, and was being
treated in the community for, sleep apnea, ulcers, H-Pylori,
back pain, and tinnitus.  VSAC at 21-22.  Gray states that he
sought medical care at the NHSP for these issues, as follows:

Gray saw NHSP Nurse Practitioner Lisa Savage on March 18, 2014, but she refused to provide him with any treatment; Gray saw NHSP Nurse Donna Dufresne on November 7, 2014, and April 23, 2015, who, on those occasions, refused to adequately examine him and denied him any treatment; Gray saw NHSP Physical Therapist Bernadette Campbell on November 7, 2014; Gray saw NHSP Nurse Practitioner Corina Neculai on November 20, 2014, but she denied all of Gray's requests for medical treatment; and Gray saw NHSP Nurse Chapman on May 22, 2015, but she failed to provide him with medical care or treatment for those problems.  VSAC at 21-22, 57; VSAC Addendum (Doc. No. 87) at 11-23.

It is undisputed that, during his incarceration, Gray filed IRS and grievance forms concerning the medical problems pertinent to his claim here, as follows:

Sleep Apnea

- April 17, 2013 - IRS to Dr. Englander (Doc. No. 72-4 at 17)
- May 28, 2013 - Level II Grievance to Medical Director (Doc. No. 72-10 at 23)
- February 5, 2015 - IRS to Medical Department (Doc. No. 72-4 at 52)
- May 31, 2015 - Level III Grievance to DOC Commissioner (Doc. No. 72-13 at 1)
- December 8, 2015 - IRS to Medical Department (Doc. No. 103-2 at 28)
- December 31, 2015 - multiple Level II Grievances to Medical Director (Doc. No. 103-4 at 1-5)

14

- February 8, 2016 - Level III Grievance to DOC Commissioner (Doc. No. 103-6 at 1)

Back Pain

- July 12, 2014 - IRS to Savage (Doc. No. 72-4 at 35)
- November 7, 2014 - IRS to Medical Department (Id. at 38)
- November 12, 2014 - IRS to Campbell (Id. at 40)
- February 5, 2015 - IRS to Medical Department (Id. at 52)
- May 31, 2015 - Level III Grievance to DOC Commissioner (Doc. No. 72-13 at 1)
- December 8, 2015 - IRS to Medical Department (Doc. No. 103-2 at 28)
- December 31, 2015 - multiple Level II Grievances to Medical Director (Doc. No. 103-4 at 1-5)
- February 8, 2016 - Level III Grievance to DOC Commissioner (Doc. No. 103-6 at 1)

Ulcers and H-Pylori

- February 5, 2015 - IRS to Medical Department (Doc. No. 72-4 at 52)
- May 14, 2015 - IRS to Medical Department (Id. at 57)
- May 31, 2015 - Level III Grievance to DOC Commissioner (Doc. No. 72-13 at 1)
- December 8, 2015 - IRS to Medical Department (Doc. No. 103-2 at 28)
- December 31, 2015 - multiple Level II Grievances to Medical Director (Doc. No. 103-4 at 1-5)
- February 8, 2016 - Level III Grievance to DOC Commissioner (Doc. No. 103-6 at 1)

Tinnitus

- February 5, 2015 - IRS to Medical Department (Doc. No. 72-4 at 52)
- May 31, 2015 - Level III Grievance to DOC Commissioner (Doc. No. 72-13 at 1)
- November 29, 2015 - two IRS forms to Medical

Department (Doc. No. 103-2 at 26-27)
- December 8, 2015 - IRS to Medical Department
  (Id. at 28)
- December 31, 2015 – multiple Level II Grievances
  to Medical Director (Doc. No. 103-4 at 1-5, 7)
- February 8, 2016 - Level III Grievance to DOC
  Commissioner (Doc. No. 103-6 at 1)

### 7.   Claim 7 –Dental Care

Gray was seen by Dr. Edward Dransite and Dental Hygienist Larry Denecourt on September 19, 2012, for an initial dental examination.  VSAC Addendum (Doc. No. 86) at 3.  Gray claims that Dr. Dransite and Denecourt found excessive decay and an abscess in one of Glenn's front teeth.  Id.  Gray states that, although he had a dental appointment on September 28, 2012, he did not receive necessary dental care, or treatment for his abscess, at that time.  Id.  Gray states that in January 2014, one of his front teeth partially fell out, while pieces of his tooth remained inside his gums.  VSAC, at 20.  Gray states that he saw Dr. Dransite on January 10, 2014, who failed to provide him with dental care on or after that date.  Doc. No. 86 at 3.

Gray was scheduled for an appointment with oral surgeon Dr. Paul Levy on January 15, 2014, but had to leave before he was seen, after waiting for the appointment for more than two hours.  VSAC Addendum (Doc. No. 86) at 3-4.  The appointment was rescheduled for February 19, 2014.  Id. at 4.  Gray states that he asked to cancel and reschedule that appointment, as he had a

conflict with a court hearing scheduled for that date, but the prison dental department refused to reschedule the appointment, and has failed to otherwise provide him with adequate care after that date.  Id.

The undisputed facts before the court demonstrate that, during his incarceration, Gray filed IRS and grievance forms with prison medical and security staff concerning the dental problems pertinent to his claim here as follows:

- May 9, 2015 - IRS to Dental Records (Doc. No. 72-4 at 56)
- June 1, 2015 – two IRS forms to Dental Records (Doc. No. 103-2 at 3)
- June 2, 2015 - IRS to Medical Director (Doc. No. 72-8 at 6)
- June 15, 2015 - Level II Grievance to Gerry (Id. at 1)
- July 10, 2015 - Level III Grievance to DOC Commissioner (Doc. No. 72-13 at 3)

8.  Claim 6 – Seizure of Religious Materials

On October 9, 2014, NHSP Sgt. Sheryl St. Peter conducted a search of Gray's cell.  Decl. of Cheryl St. Peter, Sept. 16, 2015 (Doc. No. 72-14) ("St. Peter Decl."), at 1.  During that search, St. Peter found and confiscated thirty-one newspapers, thirteen pieces of miscellaneous cardboard, twenty-one magazines, and four boxes of legal materials, which also contained newspaper articles, coupons, and sales fliers.  Id. St. Peter also found several books, including some that appeared to her to belong to the prison library or prison chapel.  Id.

St. Peter determined that the conditions in Gray's cell violated DOC Disciplinary Rule 47.C, which prohibits inmates from keeping excessive material in their cells, such that the amount of material creates a fire or safety hazard.  Id.; Attachment to PPD 5.25 (Doc. No. 72-15 at 10).  St. Peter also believed that Gray's possession of books that appeared to belong to the prison library or prison chapel violated DOC Disciplinary Rule 50.B/C, which prohibits inmates from possessing property belonging to another person.  Id.

Gray was allowed to go through his legal boxes to discard excess materials from those boxes.  St. Peter Decl. at 2.  Other written materials St. Peter deemed to be excessive were removed from Gray's cell and taken to the NHSP property room.  Id.  St. Peter removed a Bible, a religious dictionary, and religious pamphlets from Gray's cell.  Id.  St. Peter states that in enforcing Disciplinary Rule 47.C, she was executing the requirements of her job, and that she had no intent to interfere with Gray's exercise of his religion.  Id. at 3.  St. Peter issued two disciplinary reports against Gray, charging him with violating Disciplinary Rule 39.B, for failing to obey a rule, in that he had failed to timely return borrowed books to the prison library.  Oct. 9, 2014, Disciplinary Report (Doc. No. 72-17 at 1).  St. Peter issued a second disciplinary report against Gray

charging him with violating Disciplinary Rule 47.C for the excess materials in his cell.  Id. at 2.

St. Peter states that Gray was permitted to maintain some written religious materials in his cell.  St. Peter Decl. at 2. Gray disputes that assertion, maintaining that all of his religious materials were taken from his cell.  VSAC at 40.

On May 21, 2015, Gray was issued a "5-Day Notice" advising him that, within five days, he had to designate someone outside the prison to pick up his materials from the property room, or his property would be destroyed.  St. Peter Decl. at 3; May 21, 2015 5-Day Notice (Doc. No. 72-18).  An individual authorized by Gray picked up those materials.  St. Peter Decl. at 3.


### III.   DISCUSSION

A.   Summary Judgment Arguments

Defendants argue that summary judgment should be granted as to all of Gray's claims.  As to Claims 1-5, 7, and 8, defendants argue that Gray did not exhaust his administrative remedies before filing those claims in this action, as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) ("PLRA").  Defendants do not move for summary judgment based on the merits of those claims.  As to Claim 6, defendants argue that the confiscation of Gray's religious materials did not

violate Gray's First Amendment right to religious freedom.

B.    Exhaustion – Claims 1-5, 7, and 8

     1.    PLRA Exhaustion Requirement

     Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To exhaust administrative remedies under the PLRA, a prisoner must complete the administrative review process available at the place where he is confined, in accordance with the applicable procedural rules of that facility.  See Jones v. Bock, 549 U.S. 199, 218 (2007); Woodford v. Ngo, 548 U.S. 81, 93-95 (2006). The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." Porter v. Nussle, 534 U.S. 516, 532 (2002).

     Exhaustion is mandatory, and a claim must be dismissed if exhaustion of that claim is not completed prior to the filing of the claim.  See Ross v. Blake, 136 S. Ct. 1850, 1856 (2016). Accordingly, a prisoner must exhaust available administrative remedies even where the prisoner seeks relief that is not available through the administrative process.  See id. at 1857

(citing Booth v. Churner, 532 U.S. 731 (2001)).  At the summary judgment phase, defendants bear the initial burden of showing that plaintiff failed to exhaust all of his generally available administrative remedies.  See Hubbs v. Suffolk Cty. Sheriff's Dep't, 788 F.3d 54, 59 (2d Cir. 2015).  Then "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him."  Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).  The ultimate burden of persuasion remains with the defendant.  See id.

The PLRA admits of only one exception to the exhaustion requirement, in that "[a] prisoner need not exhaust remedies if they are not 'available.'"  Ross, 136 S. Ct. at 1855.  In Ross, the Supreme Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  Id. at 1859.

> [A]n administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . When the facts on the ground demonstrate that no such potential exists, the inmate has no obligation to exhaust the remedy.  Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. . . . When an administrative

process is susceptible of multiple reasonable
interpretations, Congress has determined that the
inmate should err on the side of exhaustion.  But when
a remedy is . . . essentially "unknowable" — so that
no ordinary prisoner can make sense of what it demands
— then it is also unavailable. . . . And finally, the
same is true when prison administrators thwart inmates
from taking advantage of a grievance process through
machination, misrepresentation, or intimidation.
[S]uch interference with an inmate's pursuit of relief
renders the administrative process unavailable.

Id. at 1859-60 (internal quotation marks and citations omitted).

      2.   Ignorance of Exhaustion Requirement

      Gray alleges that, due to being barred from the law library

on and after August 29, 2014, he was unaware of the PLRA

exhaustion requirement for his claims.  Gray Decl. at 4.  "A

plaintiff's failure to exhaust cannot be excused by his

ignorance of the law."  Napier v. Laurel Cty., 636 F.3d 218, 221

n.2 (6th Cir. 2011).

      Defendants' evidence, and Gray's own actions, demonstrate

that Gray was, in fact, aware of the prison's administrative

grievance process prior to August 29, 2014.  Prior to that date,

Gray filed at least thirty-five IRS forms.  Decl. of Cynthia

Crompton, Ex. A-1 (Doc. No. 72-4), at 1-35.  On April 18, 2013,

Gray received a response to an IRS he had filed concerning a

denial of photocopies, that stated "Please find attached

grievance with complete instructions, return to white mailbox."

Id. at 16.  Further, defendants have submitted evidence

demonstrating that prior to August 29, 2014, Gray filed at least seven Level II grievances.  Defs.' Obj. M. Strike, Ex. B (Doc No. 84-2).

Gray has not submitted evidence in opposition to the defendants' assertion that inmates "are informed of the grievance procedures through the Inmate Manual" and through the published grievance policy, PPD 1.16(III)(G) (Doc. No. 72-3 at 2), and Gray has not claimed that he was unaware of that policy. Instead, Gray argues that, because he was barred from the law library, he did not now that the PLRA required him to exhaust the procedures set forth in that policy prior to filing suit. As stated above, Gray's lack of knowledge on that point does not excuse his failure to satisfy that requirement.  See Napier, 636 F.3d at 221 n.2.

### 3.   Claims 4 and 7 – Medical and Dental Care

It is undisputed that at the time Gray filed his VSAC, which contained his inadequate medical and dental care claims, he had not sought relief through all three levels of the DOC's administrative grievance system.  Gray filed his VSAC on December 31, 2014.  Prior to that date, Gray had not pursued any administrative remedy concerning his dental care claims, and had not filed any Level III grievances concerning his medical care claims.  Gray does not assert specific facts to dispute that the

23

prison's administrative grievance procedures were available to him as to Claims 4 and 7.

Accordingly, defendants are entitled to summary judgment on Claims 4 and 7.  Those claims are dismissed, without prejudice, for Gray's failure to exhaust his administrative remedies as to those claims before filing this suit.

### 4.   Claims 1-3, 5, and 8

The undisputed evidence in this case, set forth above, demonstrates that, as to Claims 1-5, 7, and 8, Gray has failed to properly utilize the DOC's administrative grievance system to exhaust those claims prior to filing them in this action.  Gray argues, however, that summary judgment is inappropriate as to Claims 1-3, 5, and 8, because the DOC's grievance procedures were not available to him for the purposes of exhausting those claims.  As to each of these claims, Gray states that a prison official with apparent authority told him that his claims were not grievable through the DOC's administrative grievance process, and further, that the officials instructed Gray not to file any administrative grievance as to those claims.

A prison's "'[g]rievance procedures are unavailable . . . if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process.'" Ross, 136 S. Ct. at

1860 n.3 (citation omitted); see also Beltran v. O'Mara, 405 F. Supp. 2d 140, 154 (D.N.H. 2005) ("[p]rison officials may 'prevent' a prisoner from utilizing a remedy by incorrectly representing to the prisoner that his complaint is not grievable, or that it is grievable only through another avenue'" (citation omitted)).  Here, as to Claims 1-3, 5, and 8, Gray offers his own sworn statement as evidence that prison officials misled him concerning the availability of grievance procedures for those claims.  There is thus a genuine dispute of material fact as to whether Gray exhausted all available remedies as to each of those claims.  The motion for summary judgment on Claims 1-3, 5, and 8 is therefore denied, to the extent defendants base that motion on the PLRA exhaustion requirement.

C.   Claim 6 – Religious Materials

    1.   Sheryl St. Peter

    A restriction placed on an inmate's ability to practice his religion implicates the First Amendment.  See LeBaron v. Spencer, 527 F. App'x 25, 31 (1st Cir. 2013).  The removal of all of the written religious materials in Gray's cell on October 9, 2014, implicated Gray's First Amendment right under the Free Exercise Clause, to practice his religion.[5]  Such an impingement

---

[5] The court accepts as true, for purposes of summary judgment, Gray's testimony that St. Peter removed all of his written religious materials from his cell on October 9, 2014.

violates the Constitution, unless it was imposed pursuant to a prison policy that was "reasonably related to legitimate penological interests, and [was] not an exaggerated response to such objectives." Beard v. Banks, 548 U.S. 521, 528 (2006) (internal quotation marks and citations omitted); Turner v. Safley, 482 U.S. 78, 89-91 (1987).

> Four factors are relevant in making this determination: "(1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives to the prison regulation."

Lebaron v. Spencer, 527 F. App'x 25, 31-32 (1st Cir. 2013) (quoting Kuperman v. Wrenn, 645 F.3d 69, 74 (1st Cir. 2011)).

In examining a restriction under the Turner factors, substantial deference must be given to prison administrators' judgment. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The burden "is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Id.

The relevant policy cited by defendants to justify the confiscation of Gray's religious materials is an "excessive property" restriction. This court thus examines the DOC "excessive property" restriction, pursuant to which Gray's religious materials were seized, using the Turner factors.

### a.   Valid Rational Connection

It is undisputed that St. Peter removed items from Gray's cell because she believed that Gray had excessive written material in his cell, in violation of DOC Disciplinary Rule 47.C.  That rule prohibits an inmate from possessing

> excessive amounts of material in his cell to a degree that the area presents a cluttered, untidy appearance, restricts or interferes with the free movement of a person, creates a fire or safety hazard, or interferes with officers' visual inspection of the cell or sleeping area.

St. Peter Decl. at 1.  St. Peter has further averred that the prison's restriction on excessive property is intended to "ensure the safety and security of inmates and staff at the NHSP."  Id. at 2.

Ensuring that people can move within a cell, that a cell can be visually inspected by officers, and eliminating fire and other safety hazards are legitimate penological interests.  Cf. Hudson v. Maloney, 326 F. Supp. 2d 206, 209 n.2 (D. Mass. 2004) (finding that concerns over potential fire hazards and sanitation problems are legitimate penological objectives).  The "excessive property" policy St. Peter was following when she seized Gray's religious materials is rationally connected to that policy, as removing excess items from the cell furthers the rule's purpose.  See Simmonds v. Cockrell, 81 F. App'x 488, 489 (5th Cir. 2003) (per curiam) (upholding prison regulation that

restricts the amount of religious material that may be stored in
a prisoner's cell where policy is intended to prevent fire and
other safety hazards).  Gray has failed to demonstrate, by
competent evidence, any triable issue concerning whether the
DOC's "excessive property" policy has a rational connection to a
legitimate penological interest.  This factor weighs in favor of
defendants.

> b.   Alternative Means of Exercising First Amendment
>      Right to Religious Materials

Nothing in the record suggests that Gray would be
prohibited from having religious materials in his cell if the
total quantity of written material in his cell did not pose a
fire hazard.  Further, Gray has not presented any facts to
demonstrate that the religious materials at issue here are not
available to Gray elsewhere in the prison, or that Gray had no
other means of practicing his religion other than possessing his
written materials in his cell.  This factor thus weighs in favor
of finding that the "excessive property" policy is a valid
restriction on Gray's First Amendment rights.

> c.   Impact of Accommodation

Gray has not made any argument regarding how his interest
in retaining written religious materials in his cell could be
accommodated, without undermining the purposes of the "excessive
property" policy.  The record does not include any evidence from

which a reasonable factfinder could conclude that making an exception to the "excessive property" policy for the volume of written religious materials at issue, would not impose an undue burden on the safety and security of other inmates and staff. Accordingly, there is no genuine issue of material fact on this factor, and under the circumstances, the factor favors finding the policy to be valid.

d.   Existence of Ready Policy Alternatives

The only evidence in the record that would allow a jury to find any "ready policy alternatives" to the DOC's restrictions on "excessive materials," is St. Peter's sworn statement that she left Gray with some religious materials in his cell on October 9, 2014.  St. Peter Decl. at 4.  Gray has disputed that fact with competent evidence that St. Peter confiscated all of his religious materials on that day.  Gray Decl. at 50.  While allowing some religious items to remain in Gray's possession in his cell might be a ready alternative to removing all such items, where those items would not create a safety or fire hazard, the record lacks evidence that Gray's cell conditions, after October 9, 2014, were such that the presence of any additional religious items would no longer create a safety hazard.  Accordingly, this factor weighs in favor of a finding that the seizure of Gray's religious materials, pursuant to the

prison's excessive property policy, did not violate the First
Amendment.

### e. Summary

Gray has not shown that there is a jury question as to
whether the prison's "excessive property" policy was reasonably
related to the furtherance of a legitimate penological
objective, or as to whether his religious materials were seized
pursuant to that policy.  Accordingly, the undisputed facts in
this case demonstrate that St. Peter's seizure of Gray's
religious materials on October 9, 2014, did not violate his
First Amendment rights, and defendants are entitled to judgment
on Gray's First Amendment claim, asserted against St. Peter, as
a matter of law.

### 2. Lt. James Brown

Gray asserts that Lt. Brown violated his First Amendment
rights by failing to return his seized religious materials upon
Gray's post-confiscation request.  Because the court finds that
Gray has failed to show that there is a triable fact as to the
violation of his First Amendment rights caused by St. Peter's
seizure of his religious materials, he cannot demonstrate a
triable issue of fact as to whether Brown's failure to return
that property violated the First Amendment.  Accordingly,

defendants are entitled to judgment as a matter of law on Gray's First Amendment claim asserted against Brown.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (doc. no. 72), is granted in part and denied in part. The motion is granted as to Claims 4, 6, and 7, and is denied as to Claims 1-3, 5, and 8.  Further, defendants Dr. Celia Englander, Lisa Savage, Corina Neculai, Donna Dufresne, Cynthia Chapman, Bernadette Campbell, Edward Reilly, Richard Gerry, Christopher Kench, Sheryl St. Peter, Dr. Paul Levy, Dr. Edward Dransite, Laurent Denecourt, Alexis White, and Ransey Hill, are dropped from this action, as the court grants summary judgment as to all of the claims asserted against those individuals.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


September 20, 2016

cc:  Jeffrey M. Gray, pro se
     Kenneth A. Sansone, Esq.
     Jonathan A. Lax, Esq.
     Michael B. O'Shaughnessy, Esq.